**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Burke Construction Group Incorporated, | No. CV-20-01863-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Benson Security Systems Incorporated, *et al.*, | |
| Defendants. | |

At issue is Defendant North American Specialty Insurance Company's Motion for Summary Judgment (Doc. 23, MSJ), to which Plaintiff Burke Construction Group, Inc. filed a Response (Doc. 30, Resp.), and Defendant filed a Reply (Doc. 33). For the following reasons, the Court denies Defendant's Motion for Summary Judgment.

**I.   BACKGROUND**

This case arises over obligations pursuant to a performance bond. With limited exceptions, the facts do not appear to be in dispute.

Burke Construction Group ("Burke") was the general contractor for the construction of the Legacy Traditional School in Surprise, Arizona. (Doc. 30, Burke's Controverting Statement of Facts ("Burke CSOF")) ¶ 1; Doc. 30, Declaration of John F. Travassos in Support of Burke's CSOF ("Travassos Decl.") ¶ 3.) The contract between Burke and the project's Owner required Burke to furnish payment and performance bonds covering all performance and payment obligations (the "Prime Contract"). (NAS Statement of Facts ("NAS SOF") ¶ 4.) On or about January 14, 2020, Burke entered into an agreement with

Benson Security Systems ("Benson") for certain plumbing related work and materials for $685,236.21 (the "Construction Contract").[1] (Burke CSOF ¶ 2, Ex. 2.) Pursuant to the Construction Contract's terms, Benson obtained a payment and performance bond issued by North American Specialty Insurance Company ("NAS") (the "Bond Agreement"). (Burke CSOF ¶ 4, Ex. 3.) The Bond Agreement expressly incorporates the Construction Contract and binds Benson and NAS to Burke for the Construction Contract's performance. (Burke CSOF ¶ 5, Ex. 3 § 1.)

### A.     Bond Agreement Key Provisions

In the event of Benson's breach or default of the Construction Contract, Burke must fully comply with Section 3 to trigger NAS's obligations under the Bond Agreement. In relevant part, Section 3 requires that:

> 3.1. Burke provides notice to [Benson] and [NAS] that [Burke] is considering declaring a Contractor Default. Such notice shall indicate whether [Burke] is requesting a conference among [Burke], [Benson] and [NAS] to discuss [Benson's] performance. If [Burke] does not request a conference, [NAS] may within five (5) business days after receipt of [Burke's] notice, request such a conference. If [NAS] timely requests a conference, [Burke] shall attend...
>
> 3.2. [Burke] declares a Contractor Default, terminates the Construction Contract and notifies [NAS]; and
>
> 3.3. [Burke] has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to [NAS] or to a contractor selected to perform the Construction Contract.

(Burke CSOF, Ex. 3 § 3.) If Burke satisfies Section 3, Section 5 of the Bond Agreement provides that NAS "shall promptly and at [NAS's] expense take one of the following actions:"

> 5.1. Arrange for [Benson], with the consent of [Burke], to perform and complete the Construction Contract;
>
> 5.2. Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

---

[1] NAS contends that the contract was valued at $684,962.72 (NAS SOF ¶ 5.) The dispute is immaterial for purposes of deciding the instant Motion.

- 2 -

> 5.3. Obtain bids or negotiated proposals from qualified contractors acceptable to [Burke] for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by [Burke] and a contractor selected with [Burke's] concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to [Burke] the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by [Burke] as a result of [Benson's] default; or
>
> 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:
>
>> 1. After investigation, determine the amount for which it may be liable to [Burke] and, as soon as practicable after the amount is determined, make payment to [Burke]; or
>>
>> 2. Deny liability in whole or in part and notify [Burke], citing the reasons for denial.

(Burke CSOF, Ex. 3 § 5.) Section 6 provides Burke's rights where NAS does not comply with Section 5: it states in relevant part:

> If [NAS] does not proceed as provided in Section 5 with reasonable promptness, [NAS] shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from [Burke] to [NAS] demanding that [NAS] perform its obligations under this Bond, and [Burke] shall be entitled to enforce any remedy available to [Burke].

(Burke CSOF, Ex. 3 § 6.)

**B.**     **Construction Contract Key Provisions**

Section 24 of the Construction Contract provides Burke's rights in the event of Benson's breach of the Construction Contract. It provides in relevant part:

> If in the substantiated opinion of Burke, [Benson] has defaulted under or breached the terms of the [Construction Contract] and should [Benson] fail to cure the default complained of by Burke within seventy-two (72) hours of [Benson's] receipt of Burke's notice to cure or correct, [Benson] shall not be entitled to receive any further payments until the Work shall be fully completed and accepted by Burke, and Burke may, in its sole and absolute discretion:

> (i) Cure such Default and backcharge [Benson] for all such costs and expenses incurred, plus fifteen percent (15%) for Burke's overhead and profit, or
>
> (ii) Supplement [Benson's] work forces to prosecute and complete the work on such terms and conditions as Burke may deem necessary and backcharge [Benson] for all such costs and expenses incurred plus fifteen percent (15%) for Burke's overhead and profit, or
>
> (iii) Terminate the [Construction Contract] for cause… and complete [Benson's] work through others on such terms and conditions as Burke may deem necessary and backcharge [Benson] for all such costs and expenses incurred, plus fifteen percent (15%) for Burke's overhead and profit.
>
> Should the expense Burke incurs in curing, supplementing and/or completing the work plus the cost of any other offsets, including Burke's overhead and profit,
>
> (i)  Exceed the difference between the [Construction Contract] price and the total amount paid to [Benson], [Benson] shall, within ten (10) days after written notice, pay such excess over to Burke plus interest at eighteen percent (18%) per annum from the date of Burke's expenditure, or
>
> (ii) Be less than the difference between the [Construction Contract] price and the amount paid to [Benson], [Benson] shall be paid such amount within thirty days of the date Burke has calculated its costs and expenses to cure, supplement and/or complete [Benson's] Work, provided all conditions precedent for payment set forth herein have been met, including payment for such work by the Owner.

(Burke CSOF, Ex. 2 § 24.)

### C.     Benson's Default of the Construction Contract

Burke sent Benson and NAS three letters over the course of April 2020 (the "April Letters"). On April 8, 2020, Burke sent a letter advising them that Benson was in breach of the Construction Contract due to its use of unskilled and unsupervised labor. (Burke CSOF ¶¶ 17-21, Ex. 4.) The letter provided Benson with a 72-Hour Notice and requested a "Recovery Schedule and Staffing Plan" by Saturday, April 11, 2020. (Burke CSOF

¶¶ 21-22, Ex. 4.) Benson provided the requested plan, which Burke deemed non-responsive. (Burke CSOF ¶ 26.)

Burke sent Benson and NAS a second letter on April 14, 2020 explaining that Benson's plan was unsatisfactory and advising them that Benson "is on the fringes of contract termination due to breach and non-performance of contract." (Burke CSOF ¶ 28, Ex. 5.) Burke provided Benson with an additional chance to cure the breach but warned that if Benson did not comply with the staffing requests, Burke would terminate the Construction Contract due to "breach and non-performance of contract" and make "a claim on Benson's Payment & Performance Bond." (CSOF ¶ 30, Ex. 5.) Benson provided a revised plan but remained in breach of the Construction Contract. (CSOF ¶ 33.)

On April 23, 2020, Burke sent Benson and NAS another letter with the subject line, "Notice of Default and Contract Termination for Cause." The letter stated that "effective immediately, the [Construction Contract] with Benson is Terminated for Cause." (CSOF ¶ 36, Ex. 6.) Pursuant to Section 24 of the Construction Contract, Burke further wrote that:

> [I]n its sole and absolute discretion [Burke] will cure the Default and complete Benson's Work through others on such terms and conditions as Burke may deem necessary and back-charge Benson for all such costs and expenses incurred and seek any other relief it may be entitled to.
>
> Should the expense Burke incurs in curing, supplementing and/or completing the work plus the cost of any other offsets, including Burke's overhead and profit,
>
> (i)  Exceed the difference between the [Construction Contract] price and the total amount paid to [Benson], [Benson] shall, within ten (10) days after written notice, pay such excess over to Burke plus interest at eighteen percent (18%) per annum from the date of Burke's expenditure, or
>
> (ii) Be less than the difference between the [Construction Contract] price and the amount paid to [Benson], [Benson] shall be paid such amount within thirty days of the date Burke has calculated its costs and expenses to cure, supplement and/or complete [Benson's] Work, provided all conditions precedent for payment set forth herein have been met, including payment for such work by the Owner.

(Burke CSOF, Ex. 6.) Upon receipt of this letter, NAS sent an internal email stating, "the surety has received a claim against the above referenced bond from Burke Construction

Group." (Burke CSOF ¶ 45, Ex. 9.) However, NAS did not respond until May 26, 2020 when it sent Burke a letter acknowledging Benson's default as well as Burke's termination of the Construction Contract. NAS further informed Burke that it would not investigate as contemplated by Section 5.4.1 of the Bond Agreement because Burke had not made a demand or claim against the bond but rather opted to self-perform Benson's work. (Burke CSOF ¶ 45, Ex. 9.) In the meantime, Burke hired two contracting companies – Interstate Mechanical Corporation ("Interstate Mechanical") and Pete King Construction Company – on May 1, 2020 to complete Benson's work.[2] (Burke CSOF ¶ 44, Ex. 8; Travassos Decl. ¶ 24.) The replacement contractors completed their work on or before June 9, 2020 (NAS SOF ¶ 20.)

Burke responded to NAS on June 9, 2020 with a "formal notice of demand and claim" against the Bond, which requested $526,662.37 to reimburse Burke for its losses due to Benson's breach as well as interest for Burke's overhead and profit pursuant to Section 24 of the Construction Contract. (Burke CSOF ¶ 47, Ex. 10.)

On June 24, 2020, NAS informed Burke that it received its Bond Claim and would respond within the next 14-21 days. (Burke CSOF ¶ 48, Ex. 11.) Burke subsequently sent NAS an increased Bond Claim of $555,594.12 (Burke CSOF ¶ 49, Ex. 12.)

NAS sent Burke a letter formally rejecting Burke's Bond Claim on July 10, 2020. The letter stated that "Burke never triggered the surety's performance obligations and based upon the terms of the Bond and the supporting case law, the Bond is null and void and the surety has been discharged" (Burke CSOF ¶ 50, Ex. 13.) The parties continued to correspond asserting their positions as to NAS's obligations pursuant to the Bond Agreement (Burke CSOF ¶¶ 51-54, Exs. 14-15.)

---

[2] NAS proffered evidence that Burke hired Interstate Mechanical on April 24, 2020. (NAS SOF ¶ 14, Ex. B.) In response, Burke proffered Mr. Travassos's Declaration as well as the Interstate Mechanical subcontract dated May 1, 2020. (Burke CSOF ¶ 44, Ex. 8; Travassos Decl. ¶ 24.) At the summary judgment stage, the Court will construe conflicting evidence in favor of the non-moving party and thus credits Burke's evidence for the purposes of the instant Motion.

On September 10, 2020, Burke filed its Complaint against NAS and Benson (Doc. 1). Burke brought claims against NAS for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Bad Faith.

NAS subsequently moved for summary judgment, arguing that Burke's failure to comply with Section 3 of the Bond Agreement warranted the dismissal of all its claims against NAS.

## II.     LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

## III. ANALYSIS

Determination of this Motion starts and stops with Section 3 of the Bond Agreement. NAS argues that because Burke did not comply with Section 3, which is a condition precedent to Section 5, NAS's obligations pursuant to the Bond Agreement were not triggered. In response, Burke argues that the April Letters fulfilled its obligations pursuant to Section 3 and thus NAS's failure to comply with Section 5 constituted a default of the Bond Agreement pursuant to Section 6.

Under Arizona law, contract interpretation begins with the proposition that, where a contract's language is "clear and unambiguous, it must be given effect as it is written." *Hadley v. Sw. Props., Inc.*, 570 P.2d 190, 193 (Ariz. 1977). The mere fact that parties disagree about the meaning of a contract does not make it ambiguous. *J.D. Land Co. v. Killian*, 762 P.2d 124, 212 (Ariz. Ct. App. 1988). In addition, when interpreting a contract, "it is presumed that the parties intended to give the words employed their ordinary meaning." *Tucker v. Byler*, 558 P.2d 732, 735 (Ariz. Ct. App. 1976).

NAS first argues that the April Letters do not fulfill Section 3 of the Bond Agreement because they are "notices to cure" and not a "formal bond claim." (MSJ at 5.) NAS fails to define "formal bond claim," and neither points to language in the Bond Agreement nor cites caselaw that Section 3 requires a formal bond claim. Working off the assumption that the April letters did not fulfill Section 3, NAS spends much of its Motion for Summary Judgment arguing that hiring a replacement contractor without fulfilling Section 3 releases NAS from its obligation to perform under the Bond Agreement. (MSJ at 6-11.) Such arguments, where NAS has not met its initial burden of showing that Burke did not comply with Section 3, are insufficient to prevail as a matter of law on summary judgment.

### A.     Section 3.1

Section 3.1 requires Burke to provide notice to NAS that it is considering declaring Benson in default of the Construction Contract. Burke met this requirement through its April 8th and April 14th letters. The April 8th letter informed NAS that Benson was in breach of the Construction Contract and had 72 hours to cure. (Burke CSOF, Ex. 4.) Burke then sent a follow-up letter to NAS on April 14, 2020 stating, "Benson is on the fringes of contract termination due to breach and non-performance of contract." (Burke CSOF, Ex. 5.) These two letters provided sufficient notice that Burke was considering declaring Benson in default.

NAS argues that Burke did not request a conference as mandated by Section 3.1. (MSJ at 10.) This argument fails as well. Section 3.1 states that Burke's notice "shall indicate whether [Burke] is requesting a conference among [Burke], [Benson] and [NAS] to discuss [Benson's] performance." Such language does not mandate that Burke take any action. *See Sonoma Springs Ltd. P'ship v. Fidelity and Deposit Co. of Maryland*, 409 F. Supp. 946, 953 n. 4 (D. Nev. 2019). As such, Burke's failure to request a conference is inconsequential to whether it satisfied Section 3.1.

### B.     Section 3.2

Likewise, Burke's April 23rd letter complied with Section 3.2's requirement that Burke notify NAS of Benson's default and Burke's termination of the Construction Contract. Relying on its classification of the April Letters as "notices to cure," NAS argues that Burke did not provide "clear, direct, and unequivocal" notice of default as required by Section 3.2 (citing *L & A Contracting Co. v. Southern Concrete Services, Inc.*, 17 F. 3d 106, 111 (5th Cir. 1994)). NAS is correct on the law but wrong on the facts. The subject of the April 23rd letter is "Notice of Default & Contract Termination for Cause," and it expressly states, "Benson has defaulted under and breached the terms of the Contract" and "the Contract with Benson is terminated for Cause." (Burke CSOF, Ex. 6.) The letter provides "clear, direct, and unequivocal" notice of Benson's default and thus satisfies Section 3.2.

### C. Section 3.3

Finally, Burke's April 23rd letter satisfied Section 3.3, which requires Burke to inform NAS that it plans to 1) pay a replacement subcontractor to complete Benson's work according to the Construction Contract and 2) use the balance of the Construction Contract price to pay the replacement subcontractor.[3] (Burke CSOF, Ex. 3 § 3.) The letter stated that "in its sole and absolute discretion [Burke] will cure the Default and *complete Benson's Work through others* on such terms and conditions as [Burke] may deem necessary…" (emphasis added). (Burke CSOF, Ex. 6.) The following paragraph explains that determining whether Burke owed Benson money or vice versa depends on whether Burke had to pay the new contractors more or less than the remaining Construction Contract balance.[4] The language is copied directly from Section 24 of the Construction Contract, which further illustrates Burke's intention to hire in accordance with the Construction Contract and use its balance to pay the replacement subcontractors.[5] NAS does not address this argument.

NAS briefly argues that Burke's April 23rd letter used language indicating its plan to unilaterally complete Benson's remaining work and thus did not comply with Section 3. (MSJ at 5.) Specifically, NAS points to Burke's statement that "in its sole and absolute discretion" it would hire the replacement subcontractors to cure Benson's default "on such terms as [Burke] may deem necessary." (MSJ at 5.) NAS's argument lacks merit. The disputed language is from Section 24 of the Construction Contract and thus comports with

---

[3] Burke also would have satisfied Section 3.3 by agreeing to pay NAS the balance of the Construction Contract price. (Burke CSOF, Ex. 3 § 3.)

[4] As per Section 24 of the Construction Contract, this determination also factored in any damages and other terms triggered by Benson's breach of the Construction Contract.

[5] Should the expense Burke incurs in curing, supplementing and/or completing the work plus the cost of any other offsets, including Burke's overhead and profit,
(i)  Exceed the difference between the [Construction Contract] price and the total amount paid to [Benson], [Benson] shall, within ten (10) days after written notice, pay such excess over to Burke plus interest at eighteen percent (18%) per annum from the date of Burke's expenditure, or
(ii) Be less than the difference between the [Construction Contract] price and the amount paid to [Benson], [Benson] shall be paid such amount within thirty days of the date Burke has calculated its costs and expenses to cure, supplement and/or complete [Benson's] Work, provided all conditions precedent for payment set forth herein have been met, including payment for such work by the Owner.

Section 3.3 of the Bond Agreement. While the language may conflict with NAS's rights to work with Burke to cure the breach pursuant to Section 5 of the Bond Agreement, such conflict would at most create an ambiguity. *See Harmelin v. Silverleaf Club LLC*, Case No. CV-19-05431-PHX-JJT, 2020 WL 3545561, at *4 (D. Ariz. June 30, 2020) ("Ambiguity may exist when two contractual provisions are in conflict with each other.") (citing Williston on Contracts 4th (2020) § 30:4). NAS did not address this potential conflict or how it should be resolved and thus Summary Judgment would be inappropriate on such basis.[6]

NAS's specific arguments on 3.3 are similarly unconvincing. NAS first argues that "none of Burke's notice letters state that… it would pay its selected replacement contractors to complete Benson's work." (emphasis in original). (Reply at 6.) However, Burke's April 23rd letter expressly states, "[Burke] will cure the Default and complete Benson's Work through others." (Burke CSOF, Ex. 3.) NAS next contends that even if Burke notified NAS of its plan to hire other contractors, its failure to agree to pay NAS the contract balance violates Section 3.3. (citing *LaSalle v. JST Properties LLC*, 2011 WL 3268099 (E.D. Mich. July 29, 2011). (MSJ at 12-13; Reply at 6, 11-12.) Section 3.3.'s plain language forecloses this argument. *See* Burke CSOF, Ex. 3 § 3 (requiring that Burke "has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to… *a contractor selected to perform the Construction Contract*." (emphasis added)); *Sleeper Village, LLC v. NGM Ins. Co.*, 2010 WL 1434306, at *1 (D. N.H. Apr. 9, 2010) (holding contractor complied with Section 3.3 where it informed surety that it had identified a contractor willing to complete the construction contract).

Moreover, the caselaw NAS cites is distinguishable. In *LaSalle*, the contractor hired and paid the construction contract's balance to the subcontractor without notice to the

---

[6] Regardless, the potential conflict between Section 24 of the Construction Contract and Section 5 of the Bond Agreement does not demonstrate as a matter of law that Burke did not fulfill Section 3. If anything, an issue only would arise if NAS chose to proceed under Section 5, which would create a conflict between whether NAS had a voice in Burke's cure of Benson's breach or whether Burke could cure the breach "in its sole and absolute discretion." But this discussion is of no moment because NAS did not respond to Burke's April Letters.

surety and then argued to the court that it could not fulfill Section 3.3 because no contract balance remained. NAS attempts to shoehorn the instant case to fit *LaSalle's* facts, arguing that "Burke's hiring and paying the replacement contractor does not constitute satisfying the Section 3.3 condition precedent as a matter of law." (Reply at 11.) Here, however, Burke's April 23rd letter informed NAS that it planned to hire contractors using the balance of the construction contract, which put NAS on notice to comply with Section 5.

NAS also cites *Stonington Water Street Associates, LLC. v. Hodess Building Company*, Inc., 792 F. Supp. 2d 253 (D. Conn. 2011), but in that case the contractor hired and paid the remaining contract balance to the replacement subcontractors without notifying the surety that it had terminated the contract or agreed to pay a replacement contractor. *Id.* at 267-68. Moreover, the contractor's payments to the replacement subcontractor expressly violated the construction contract in violation of Section 3.3. *Id.* at 269. Here, Burke expressly informed NAS that it planned to hire others to cure Benson's breach in accordance with the Construction Contract. Importantly, NAS does not raise the argument that Burke's actual payments to Interstate Mechanical or Pete King Construction Company violated the Construction Contract.

Finally, Burke proffered evidence that upon receipt of its April 23rd letter, NAS circulated an internal email that it had received a claim under the bond. (Burke CSOF ¶ 45, Ex. 9.) The email is not dispositive of Burke's compliance with Section 3. NAS was within its rights to conclude that it did not need to act under Section 5. However, the email is evidence that NAS was on notice of a potential bond claim and not solely under the impression that Burke planned "to go [at] it alone." (Reply at 4.) The internal email is also evidence that there is some ambiguity as to how a contractor fulfills Section 3.3's requirements. Sections 3.1 and 3.2 expressly mandate notice to the surety. Section 3.3 does not but logic dictates that notice is required because Section 3.3 is a condition precedent to trigger the surety's obligations. NAS neither cited caselaw nor addressed what minimum actions constitute compliance with Section 3.3. The question is further complicated by Section 3.3's requirement that the contractor comply with the construction contract, which

is different in every case. Where the contract is ambiguous and the Court cannot ascertain the parties' intent, the ambiguity is construed against the drafter. *See Town of Marana v. Pima Cty.*, 281 P.3d 1010, 1015 (Ariz. App. 2012). Here, NAS furnished the Bond Agreement to Burke. (NAS SOF ¶ 1.) As such, any ambiguity is construed against NAS, which further warrants finding that NAS did not meet its burden to prevail on summary judgment.

### D.   NAS Breach

Upon Burke's compliance with Section 3, NAS was required to "promptly" act under Section 5. Failure to do so would place NAS in default seven days after receipt of additional notice from Burke. NAS does not contend that it promptly fulfilled Section 5. Nor does it argue that Burke failed to take necessary actions to trigger default under Section 6.[7] Accordingly, the Court denies NAS's Motion for Summary Judgment on Burke's breach of contract claim.

### E.   Burke's Claims for Breach of Good Faith and Fair Dealing & Bad Faith

NAS's Motion for Summary Judgment on Burke's other claims necessarily relies on Burke's failure to comply with Section 3 of the Bond Agreement. Because NAS failed to show as a matter of law that Burke did not comply with Section 3, the Court denies NAS's Motion for Summary Judgment on these issues as well.

**IT IS THEREFORE ORDERED** denying Defendant NAS's Motion for Summary Judgment (Doc. 23).

Dated this 30th day of September, 2021.

Honorable John J. Tuchi
United States District Judge

---

[7] NAS's Reply appears to briefly contend that Burke never placed NAS in default under Section 6 of the Bond Agreement. But this argument is based on Burke's failure to comply with Section 3.